**BALTIMORE BUTTERINE CO.** et al. v. **TAL-MADGE, Commissioner of Agriculture** *of Georgia.*

District Court, S. D. Georgia.   May 13, 1929.

No. 60.

George Norman Murdock and James Hamilton Lewis (of Lewis, Folsom & Murdock), both of Chicago, Ill., and James C. Davis (of Wright & Davis), of Atlanta, Ga., for plaintiffs.

George M. Napier, Atty. Gen., T. R. Gress, Asst. Atty. Gen., and Mark Bolding (of Howell, Heyman & Bolding), of Atlanta, Ga., for defendant.

BARRETT, District Judge. The petitioners in this case, with the name and the description of the food products involved (with the description of the respective containing cartons, on which are shown the place where said article has been manufactured), are: Baltimore Butterine Company; "nutie;" "prepared for baking and pastry. Ingredients cocoanut and peanut oil, salt and water. Artificially colored." Dixie Margarine Company, "Dixie brand colored nut product," "This product contains vegetable oils, salt and water. Artificially colored for baking, cooking, shortening." Standard Nut Margarine Company, " 'Southern' Nut Product. Artificially colored;" "This product is made from the very best vegetable fats and cannot be excelled for cooking, baking, and seasoning." National Foods, Inc., "Sonny Boy artificially colored shortening." E. F. Drew & Co., "Xtra Fine artificially colored. Colored vegetable shortening;" "Especially prepared for cooking and baking from vegetable and nut oils, salt and water." Ed S. Vail Butterine Company, "Flavonut. A nut product prepared exclusively for baking, cooking and shortening from cocoanut and peanut oils, salt and water. Artificially colored." All of the cartons of said products have stamped upon them "1–10 of 1% benzoate of soda," except the Southern Nut Product. It will be observed that "Sonny Boy" did not affirmatively show that it was made from vegetable oils. Inasmuch as the other five products did affirmatively show such statement, no differentiation will be attempted.

The commissioner of agriculture and the Attorney General of the state of Georgia, after notice and response from the petitioner as provided by the Food and Drugs Act of the state (Code Ga. 1910, § 102; Acts 1906,

p. 83), promulgated the following conclusions:

"1. Said substance, the Southern Nut Product, while being used as a substance for shortening, is adulterated, in that water and salt have been added in a proportion exceeding one per cent., and it has also been adulterated to the extent that water and salt have been substituted in part for the shortening it was designed to substitute.

"2. That said substance, to wit, Southern Nut Product, is misbranded to the extent that it is an imitation in package of another substance of a previously established name, to wit, Creamery Butter. The said substance being in square cartons to contain one pound, and the same being divided into four quarter-pound cubes, and the same being colored exactly like creamery butter, it is well-nigh impossible for the customer or user to distinguish it from creamery butter."

The petition averred that the defendant Eugene Talmadge, commissioner of agriculture of the state of Georgia, after such conclusions had been reached, "informed counsel for petitioners that he intended to and would immediately seize all of the said products of petitioners in the state of Georgia, for confiscation, not only in the hands of retailers and dealers, but in the hands of jobbers and wholesalers, wherever the same may be found, and that he would prosecute all retailers, dealers, jobbers, and wholesalers handling petitioners' said products, on a charge of selling adulterated and misbranded food products." It was agreed that such conclusions and threats should apply to all of said petitioners and their said products, just as if formal notice and hearing had been had in each case.

It was averred that the manufacture and sale of the products of petitioners are covered by the proviso in section 5, subsec. 4, of said Food and Drugs Act, set forth in the opinion under section 2104 of the Code of Georgia.

It was further averred that the authority claimed by the defendant for the adoption of "Conclusion 1" by himself and the Attorney General was found in section 21 of said Food and Drugs Act, Code of Georgia 1914, § 2115, defining a "mixed edible fat" as follows:

"A mixed edible fat is defined to be a mixture which contains not less than ninety-nine per cent of sweet mixed fat, and may consist of a mixture of refined cottonseed-oil or other edible vegetable oils with sweet beef fat or other edible animal fat, and must be sold under a registered or a proprietary brand and properly labeled with a distinctive trade-mark or name bearing the name of the manufacturer."

Petitioners aver that such definition does not apply to any of their products, but also aver that the defendant contends that it does apply, and he insists that the sale of said products is violative of said act, because they do not contain 99 per cent. of sweet mixed fat, and because they contain salt and water which together exceed 1 per cent. of the constituents of the product. Petitioners aver that, thus interpreted, it is unconstitutional.

In the petition the Food and Drugs Act and the respective sections thereof involved in this case were attacked as unconstitutional on several grounds, all of which were abandoned, except that which attacked said portion of section 21 of such act, as interpreted and sought to be enforced by the defendant, as a violation of the due process clause of the United States Constitution, in that, as applied to the products of petitioners, it is an arbitrary, unreasonable, and unjustifiable requirement.

Allegations were made showing great injury to property and a destruction of the business of petitioners to an extent in excess of the jurisdictional amount.

The prayers of the petition, in addition to the general prayer, are as follows:

"(a) That defendant, his assistants, agents, and employees, be temporarily and permanently enjoined from attempting to confiscate any of petitioners' products, and from instituting prosecutions against petitioners and against retailers, dealers, and jobbers handling petitioners' said products in the state of Georgia.

"(b) That defendant be temporarily and permanently enjoined from sending letters to food dealers on defendant's mailing list containing derogatory statements concerning petitioners' said products, and from publishing such statements or letters in the Georgia Market Bulletin, and from issuing statements to the newspapers or to newspaper reporters containing statements derogatory to the said products of petitioners."

Manifestly the prayers are much broader than could be granted in this case, for, construed literally, it would enjoin the defendant from the named actions upon any ground or grounds not dealt with in this petition as well as upon those dealt with. The determination will be therefore as to whether or not a decree should be granted enjoining the defendant from taking any action against the products of petitioners based upon the afore-

said conclusions on the part of himself and the Attorney General.

1. The defendant contends that this court has no jurisdiction. Inasmuch as one of the objections to the jurisdiction is because it is claimed that this is practically a suit against the state of Georgia it is appropriate to bear in mind the following statement by the Supreme Court of the United States, where a like question was involved:

"The question of jurisdiction, whether of the Circuit Court or of this court, is frequently a delicate matter to deal with, and it is especially so in this case, where the material and most important objection to the jurisdiction of the Circuit Court is the assertion that the suit is in effect against one of the states of the Union. It is a question, however, which we are called upon, and which it is our duty, to decide. Under these circumstances, the language of Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 264, 404 [5 L. Ed. 257], is most apposite. In that case he said: 'It is most true that this court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the Legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously perform our duty." Ex parte Young, 209 U. S. 123, 142, 28 S. Ct. 441, 446 (52 L. Ed. 714, 13 L. R. A. [N. S.] 932, 14 Ann. Cas. 764).

■ Petitioners aver, and I concur in their conclusion, that that portion of section 21 of the Food and Drugs Act which is relied upon for the authority to prohibit the sale of these products in Georgia because they are adulterated does not apply to the products. That portion of this section defines "mixed edible fat" and affirmatively contemplates that such mixed edible fat shall contain "sweet beef fat or other edible animal fat." The question in this case is not the sale of "mixed edible fat," for, as has been shown, it affirmatively appears by averment, which was confirmed by the evidence, that the products involved contain no animal fat, but were made wholly from vegetable oils, water, and salt

and harmless coloring matter. The interpretation placed upon the act by the defendant would prohibit the sale of any compound of vegetable oils, under whatever name, and for whatever food purpose, containing less than 99 per cent. of fat. It is undenied that the products of petitioners contain no poisonous or deleterious matter; that they are wholesome as food and affirmatively show their constituent elements. Any law that would prohibit the sale of any combination of fats under honest and appropriate names, because such combination contained less than 99 per cent. of fat and because it contained water and salt, would be a violation of the due process clause of the Constitution. Admittedly a prohibition against the sale of such products under the name of "mixed edible fat," or, by reason of another portion of such section, as "lard," unless they contained such required percentage of fats, would be constitutional. Hutchinson Ice Cream Co. v. State of Iowa, 242 U. S. 153, 37 S. Ct. 28, 61 L. Ed. 217, Ann. Cas. 1917B, 643, The Hebe Co. v. Shaw, 248 U. S. 297, 39 S. Ct. 125, 63 L. Ed. 255. But here the interpretation is that any compound of fats containing an admixture of salt and water, and not containing 99 per cent. of fat, is adulterated.

■ Even if the law does not justify such meaning, but if the defendant is so interpreting it, and is threatening to enforce it as if it had such a meaning, this court would have jurisdiction. Greene v. Louisville & Interurban R. R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88, in which the second headnote reads:

"The principle settled in Ex parte Young, 209 U. S. 123 [28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764], to the effect that a suit to restrain state officials from enforcing an unconstitutional state statute in violation of plaintiff's rights and to his irreparable damage is not a suit against the state, applies also when the statute itself is constitutional but the attempted administration of it is not."

■ Even if this court did not consider it necessary to decide the federal question, or decided it adversely to petitioners, but thought that such questions "are not merely colorable, but are raised in good faith and not in a fraudulent attempt to give jurisdiction," it would have jurisdiction to decide the whole case. Siler v. Louisville & Nashville R. R. Co., 213 U. S. 175, 29 S. Ct. 451, 53 L. Ed. 753, Ohio Tax Cases, 232 U. S. 576, 34 S. Ct. 372, 58 L. Ed. 737.

■ It is further contended that this court

908

has no jurisdiction, because no court of equity would have jurisdiction. No denial is made of the proposition, in connection with this issue, that if the facts justified a court of equity in taking jurisdiction between citizens of the same state that this court would be justified in taking jurisdiction when the parties are citizens of different states and the requisite amount exists. The Supreme Court of the United States, in the case of Reagan v. Farmers Loan & Trust Co., 154 U. S. on page 391, 14 S. Ct. 1052, 38 L. Ed. 1014, said:

"* * * For it may be laid down as a general proposition that, whenever a citizen of a state can go into the courts of a state to defend his property against the illegal acts of its officers, a citizen of another state may invoke the jurisdiction of the federal courts to maintain a like defence. A state cannot tie up a citizen of another state, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. Given a case where a suit can be maintained in the courts of the state to protect property rights, a citizen of another state may invoke the jurisdiction of the federal courts."

The contention on this branch of the jurisdictional question is that a court of equity has no authority to restrain a criminal prosecution. The principle with its modifications is thus briefly stated by the Supreme Court of the United States in Truax v. Raich, 239 U. S. 33, 37, 36 S. Ct. 7, 9 (60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283):

"It is also settled that while a court of equity, generally speaking, has 'no jurisdiction over the prosecution, the punishment or the pardon of crimes or misdemeanors,' (In re Sawyer, 124 U. S. 200, 210 [8 S. Ct. 482, 31 L. Ed. 402]), a distinction obtains, and equitable jurisdiction exists to restrain criminal prosecutions under unconstitutional enactments, when the prevention of such prosecutions is essential to the safeguarding of rights of property."

A most cursory reading of the petition in this case will show that the activities threatened by the defendant will utterly destroy the business of the petitioners in this state and therefore property rights are involved. Not only has the defendant threatened to prosecute and to take the necessary proceedings to confiscate the property of petitioners, but he, together with the Attorney General, has actually promulgated conclusions which, if valid, constitute a continuing menace, not only to petitioners, but to all who may desire to deal in the products of petitioners.

█ 2. For brevity we will deal only with the product considered in the conclusions of the defendant and the Attorney General, namely, "Southern Nut Product." Conclusion No. 1 condemns this article, not because it is an "edible animal fat" and has water and salt in it, but "while being used as a substance for shortening" is thus adulterated. As a matter of fact the carton in which it is contained does not describe it as a "shortening." ("Sonny Boy," "Xtra Fine" and "Flavonut" are thus described.) If the conclusion reached by the defendant and the Attorney General be correct, the result must follow that any article containing fat and sold for "cooking, baking and seasoning" cannot be sold in the state when it contains salt and water, if perchance it is used by some one as "shortening." It is unnecessary, in view of what has been previously said, to further discuss this, except to call attention to the fact that there is no definition in section 21 of "shortening."

█ 3. Is conclusion No. 2 of the defendant and the Attorney General justified?

The Supreme Court of the United States, in the case of United States v. Lexington Mills, 232 U. S. 399, 409, 34 S. Ct. 337, 340 (58 L. Ed. 658, L. R. A. 1915B, 774) has declared the purposes of the national Food and Drugs Act (21 USCA §§ 1 et seq.) as to interstate commerce, viz.:

"The statute upon its face shows that the primary purpose of Congress was to prevent injury to the public health by the sale and transportation in interstate commerce of misbranded and adulterated foods. The legislation, as against misbranding, intended to make it possible that the consumer should know that an article purchased was what it purported to be; that it might be bought for what it really was and not upon misrepresentations as to character and quality. As against adulteration, the statute was intended to protect the public health from possible injury by adding to articles of food consumption poisonous and deleterious substances which might render such articles injurious to the health of consumers."

It is to be conclusively presumed that the state had a like purpose in adopting its act as applicable to intrastate commerce. It must be borne in mind throughout that this article, when placed in the streams of commerce by its manufacturer and when purchased by the consumer, had nothing on its container to indicate that it was an imitation of anything, and certainly not of creamery butter. Instead of by implication or otherwise claiming to be the product of milk or cream, it affirmatively in its name indicated that it was derived from "nut". Not

only did its name thus affirmatively indicate that it was no imitation of creamery butter, but in extenso the words on the carton declared "This product is made from the very best vegetable fats and cannot be excelled for cooking, baking and seasoning." The alleged elements of imitation are (a) it is in square cartons containing one pound; (b) the pound is divided into four quarter-pound cubes; and (c) it is colored exactly like creamery butter. It hardly could be contended that an article of food should not be sold in pound packages because some other article of food was sold in pound packages, and it could hardly be contended that the adoption of the plan of dividing a pound of food into four cubes pre-empted such practice as against all other food producers, and it can hardly be contended that the color of creamery butter, even though it were always the same (contrary to the evidence), would pre-empt it as against all other foods of such color. It does not appear in the "conclusion," nor was it urged at the hearing, that there was any reason for any purchaser of a carton of "Southern Nut Product" to be deceived into thinking that it was creamery butter.

Apparently the defendant and the Attorney General dealt with this as a package, for the language of the finding is that "it is an imitation in package of another substance." It is at least doubtful whether the sale in packages of a substance manufactured and put into commerce so marked as to prevent any reasonable conclusion that it was intended as an imitation of another article of food would come under the ban of this act, because perchance some purchaser might, either as purchased or in some other way, use it either as an imitation of or as a substitute for another article of food. The prohibition of the statute is: "It shall be unlawful for any person to manufacture, sell, or offer for sale, any article of food, drugs, medicines, or liquors which is adulterated or misbranded," etc. Code Ga. 1914, § 2101. "Use" is not prohibited. Is it not true that "imitation" indicates something intentional rather than incidental? It imports more than mere resemblance or similitude. If such be true, can any one conceive that the manufacturer of this product was intending to produce an imitation, when it was so named and described as to make that impossible?

Furthermore there is no requirement of the law that a person must use either creamery butter or go without any substitute therefor, provided the substitute was not sold so misbranded as to deceive or so adulterated as to injure. The purpose of this law, it must be remembered, is not to protect other industries, even though they be so important as the dairy industry, but is to protect the consumers from deception or injury. If this be not the correct view, the state is committed to the use of creamery butter for all time for the purposes now used, and cannot use any substitute therefor derived from other sources, even though more economical, more palatable, and more popular.

It would be unprofitable to attempt to even briefly state the evidence in this case. There, however, was none to show that this food was deleterious or unwholesome, or that any purchaser from any store was deceived into believing that it was creamery butter, or an imitation of creamery butter. There was, however, evidence on the part of the defendant to show that under all except entirely normal conditions it could be ascertained by taste or by the product's becoming more easily and flowingly liquid under heat and crumbling under cold that it was not creamery butter. It was also disclosed by some testimony that those who had used both creamery butter and this product, or one of like kind, preferred this product to the creamery butter. The samples produced to the court (who is not an expert on food) were similar in appearance to much butter he has seen, though quite different in appearance from much other butter he has seen. It seemed to the court that the taste and the odor were distinctive. It was further disclosed that, in order to keep this product in a condition where it would appear even like butter, it was necessary to have the container kept down to a rather low temperature, and for such purpose ice was used. It was in evidence that it would when cold crumble, and could not be spread like creamery butter. Under the evidence this court is convinced that this product is not an imitation of creamery butter, and the prohibition of its sale as now made would be an invasion of the constitutional rights of the manufacturer. The fact that sometimes it was used as a substitute for butter without being declared to be such would not justify its being banned under this act. Two instances of its use are significant: One by a prosperous college for girls, where creamery butter had been used, and where this was used for a while as a substitute, and then again creamery butter was used, and a request was made by the girls that the use of this product be renewed; in the other case it was used by a state institution. And there was evidence as to its use in an Augusta hotel during the progress of this case, where one

910

of counsel for defense was boarding, and who discovered by taste or smell or sight that it was such product and not creamery butter, to the effect that both creamery butter and this product were used, and that at times the guests expressed a preference for this product over butter.

In the case of United States v. Ninety-Five Barrels of Vinegar, 265 U. S. 438, 44 S. Ct. 529, 68 L. Ed. 1094, it was decided that it was in violation of the federal Food and Drugs Act to advertise as "apple cider vinegar made from selected apples," when in fact the vinegar was made from evaporated apples with the addition of water, notwithstanding the fact that the resulting vinegar was in appearance, taste, and contents practically identical with that made from the juice of the apples; but could it be thought that, if this manufactured vinegar had been advertised as "vinegar made from evaporated apples," its sale would have been prohibited because a landlady saw fit to serve it in a cruet that did not declare whether it was "apple cider vinegar" or a vinegar made from evaporated apples?

Petitioners contend that they are in full compliance with the affirmative requirements of the Food and Drugs Act of Georgia as to misbranding. It may be of profit to carefully examine the provisions of such act. They are contained in section 2104 of the Code (1914) of Georgia. The first paragraph of such section is as follows:

"*Misbranding.* The term 'misbranded', as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such articles, or the ingredients or substances contained therein, which shall be false or misleading in any particular, and to any food or drug product which is falsely branded as to the state, territory, or country in which it is manufactured or produced."

Immediately thereafter is this language:

"For the purpose of this chapter, an article shall also be deemed to be misbranded—

"In case of drugs: * * *

"In case of food:

"1. If it be an imitation of, or offered for sale under the distinctive name of, another article.

"2. If it be labeled or branded so as to deceive or mislead the purchaser, or purport to be a foreign product when not so, or is an imitation in package or label of another substance of a previously established name, or

which has been trade-marked or patented. * * *

"3. If in package form, the quantity of the contents be not plainly and conspicuously marked on the outside of the package in terms of weight, measure, or numerical count. * * *

"4. If the package containing it or its label shall bear any statement, design or device regarding the ingredients of the substances contained therein, which statement, design, or device shall be false or misleading in any particular: Provided, that an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases:

"(1) In the case of mixtures or compounds which may be now, or from time to time hereafter, known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.

"(2) In the case of articles labeled, branded, or tagged, so as to plainly indicate that they are compounds, imitations, or blends, and the word 'compound,' 'imitation,' or 'blend,' as the case may be, is plainly stated in conspicuous letters on the package in which it is offered for sale. * * *"

There is no claim that the sale of this article violates the general principle of misbranding, as set forth in the first paragraph of such section. The most casual reading of the provisions as to misbranding—"for the purpose of this chapter"—discloses that they deal with articles *as sold in commerce.* The language in section 1 is "offer for sale." Paragraphs 2, 3, and 4 affirmatively deal with food in packages. Petitioners insist that they are affirmatively protected under subsection 1 of section 4 above; that their products are mixtures or compounds, are articles of food, have distinctive names, are not imitations of or offered for sale under the distinctive name of another article, and have on the label or brand a statement of the place where the said article has been manufactured or produced. The defendant contends that this proviso does not apply, for the reason that the names of the products of petitioners are not "distinctive," within the meaning of the act. It must be borne in mind that "distinctive" is used, and not "descriptive."

A view urged by defendant is that the

name either in its primary or secondary signification must *describe its contents*. The ordinary use of language denies such construction. Distinctive means that which distinguishes it from another. If that were not true, then what would become of the inhibition contained in paragraph 1, above quoted, if the name of an article already on the market, but not for long, had a name that was ever so arbitrary, but which did not describe the contents, and which had not been before the public long enough for its secondary meaning to convey an understanding of its contents. Would not the ordinary understanding comprehend the name "Southern Nut Product" as distinctive? It certainly distinguishes it from creamery butter, and, so far as has been evident to the court, it distinguishes it from every other article of food in the world, and thus is a distinctive name.

That a package as put into commerce by the manufacturer is dealt with is made more clearly manifest by the following language in such proviso: "If the same be accompanied on the label or brand with a statement of the place where said article has been manufactured or produced." It is the finding of the court that "Southern Nut Product" is a distinctive name, that it is not an imitation of or offered for sale under the distinctive name of another article, and that it is in compliance with the requirement as to the label or brand showing where it was manufactured.

It is therefore ordered and decreed that the defendant, Eugene Talmadge, who occupies the position of commissioner of agriculture for the state of Georgia, shall be and he hereby is permanently enjoined from taking any action against the petitioners, or any of them, or against any of the products described in the petition, or against any one selling or using such products, to enforce the findings in conclusions 1 and 2 reached by said defendant and the Attorney General of the state of Georgia, and said defendant, Eugene Talmadge, as such commissioner of agriculture and individually, is hereby further permanently enjoined from publishing in the Georgia Market Bulletin, or through his mailing lists to food dealers or others, either himself or through any other agent or agency, any statement or information to the effect that the conclusions 1 and 2 above referred to are legal or effective as to any of said products, and that any action will be had or is contemplated by him under and by virtue of said two conclusions, or either of them.